ALEXANDER B. TRUEBLOOD (WA Bar No. 50612)
TRUEBLOOD LAW FIRM
1700 Seventh Ave, Suite 2100
Seattle, Washington 98101-1360
Telephone: (206) 707-9685
Facsimile: (206) 832-4676

Attorneys for Plaintiffs
HECTOR and LINDA LOYOLA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

SPOKANE DIVISION

| | |
|---|---|
| HECTOR LOYOLA, and LINDA LOYOLA, | Case No: 2:19-CV-2 |
| Plaintiffs, | **OPPOSITION TO MOTION TO COMPEL ARBITRATION** |
| vs. | 4/10/2019<br>Without oral argument |
| AMERICAN CREDIT ACCEPTANCE, LLC, PAR, INC., and JILLIAN RAE LEE-BARKER dba COEUR D'ALENE VALLEY RECOVERY SERVICES, | |
| Defendants. | |

# I. INTRODUCTION

This is an action for wrongful repossession brought by a retired couple, Linda and Hector Loyola, against a subprime lender and its two repossession agencies. Plaintiffs allege that defendants broke into their locked gate and repossessed their vehicle.  Breaking a gate or lock is a breach of the peace under the UCC in all 50 states, and violates the Consumer Protection Act and the Fair Debt Collection Practices Act.

In 2013, Hector Loyola was forced to retire as a railroad worker, due to a physical disability.  As a result of Hector's retirement, he and his wife Linda lost significant income, and finally their home to foreclosure. They began living on a limited pension income in one of the rougher neighborhoods in Spokane. In the fall of 2016, the Loyolas had a van which was on its last legs, had transmission problems, would not go up hills, and was incurring them tickets for excessive smoke.  They desperately needed a working car. <u>See</u> Loyola declarations.

The Loyolas went to several dealerships but were turned down for credit. On October 30, 2016, after seeing TV ads by LHM Toyota in Spokane offering to help consumers with challenged credit, they bought a 2012 Dodge Journey with over 90,000 miles on it.  The dealership imposed a 28% interest rate on the Loyolas, and charged them $36,000 overall, but they had nowhere else to go.

Mrs. Loyola was seriously ill at the time and never went to the dealership. Instead, the salesman came to the Loyolas home, where they signed the papers in a rush. The Loyolas never knew they were signing two contracts, a "Retail Purchase Agreement" ("Buyer's Order") and the retail installment sales contract ("RISC"). They were only aware of the RISC. The dealership did not give them a copy of the Buyer's Order. The Buyer's Order had an arbitration clause -- in fine print on the back page, in less than the eight point type required by Washington law.  The RISC -- the only contract the Loyolas knew about -- does not have an arbitration clause.

The dealership never told the Loyolas about their right under Washington law

to cancel the transaction within three days, under Washington's home solicitation statute.  The dealership also violated Washington's "single document rule" by having the Loyolas sign two separate contracts, when only one was permitted.

LHM Toyota assigned the RISC to defendant American Credit Acceptance, LLC ("ACA"), but not the Buyer's Order. The assignment box in the RISC reflects that ACA is the assignee, but the Buyer's Order does not contain a similar assignment.  Compare Docket No. 8-1 with Docket No. 8-2.

The Loyolas made payments under the RISC, but after two years, they had fallen behind. In November, 2018, ACA hired defendant Par, Inc., a national repossession agency in Indiana, to repossess the Dodge. Par in turn contracted with defendant Jillian Rae Lee-Barker, a resident of Idaho, to physically repossess the vehicle.

According to the California Department of Consumer Affairs, defendant Lee-Barker had her California repossession license revoked in November, 2017 for three separate incidents of having unlawfully entered secured areas to repossess a vehicle. See Request for Judicial Notice, Exhs. 1-2. In addition, the Department of Consumer Affairs accused Lee-Barker's agency of using violence during repossessions and failing to report that violence, and that Lee-Barker herself personally threatened to send someone over to "take care of" one debtor and his family if he reported a beating by one of her repossessors (her husband).  Defendant Lee-Barker admitted all of these allegations, except the threat to harm the debtor. Id.  The California authorities revoked Lee-Barker's license, which was stayed for a three year probationary period. Id.

Instead of completing her probation, Lee-Barker fled to Idaho and opened up a new repossession agency under the fictitious name, "Cour D'Alene Valley Recovery Services," which she now runs out of her parent's remote country home in Idaho. Unlike California, Idaho does not license or regulate repossession agencies, leaving Lee-Barker free to operate without further unwanted scrutiny.

The Loyolas always kept their vehicle behind a locked metal gate, with a padlock, because thefts occur often in their neighborhood.  On November 26, 2018, Defendant Lee-Barker's employee arrived at the Loyola's home, broke the metal latch off the Loyola's locked gate, repossessed the vehicle, and stole the broken latch, leaving the still-closed padlock attached to the other side of the gate. Plaintiffs allege this was a breach of the peace in violation of RCW § 62A.9A-609(b)(2). The result is that the defendant ACA must pay the Loyolas statutory penalties under the UCC, and the defendant repossession agencies have violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692f(6).

The present motion to compel arbitration should be denied. Defendants are strangers to the agreement, and have no standing to compel arbitration.  The arbitration clause in the Buyer's Order expressly states that the dispute resolution procedures of the RISC control in case of a conflict, and the RISC chooses court as the dispute forum. The Buyer's Order is also nullified by the integration clause in the RISC. The Buyer's Order is also unenforceable for violations of Washington's "single document rule," and because it is procedurally and substantively unconscionable.  The clause contains a laundry list of one-sided and harsh provisions, all designed to reserve court exclusively for the creditor, while imposing an arbitration with grossly unfair procedural rules on the consumer.

## II.  ARGUMENT

A.    <u>None Of The Defendants Has Standing To Compel Arbitration</u>

None of the defendants signed any arbitration clause, and none has standing to compel arbitration here.  The general rule is that "[O]ne must be a party to an arbitration agreement to be bound by it or invoke it. The strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration." <u>Murphy v. DirecTV, Inc.</u>, 724 F.3d 1218 (9th Cir. 2013).  "The right to compel arbitration stems from a contractual right" that "may

1   not be invoked by one that is not a party to the agreement and does not otherwise

2   possess the right to compel arbitration." Britton v. Co-op Banking Group, 4 F.3d

3   742, 744 (9th Cir, 1993).  The only exception to this rule would be if a "preexisting

4   confidential relationship, such as an agency relationship between the nonsignatory

5   and one of the parties to the arbitration agreement, makes it equitable to impose the

6   duty to arbitrate upon the nonsignatory." Murphy v. DirecTV, 724 F.3d at 1232.

7   But none of the defendants here had any preexisting confidential relationship with

8   LHM Toyota, the entity which signed the Buyer's Order containing the arbitration

9   clause.

10      Defendant ACA claims a confidential relationship with LHM Toyota because

11  it says it is an "assignee."  But ACA was an assignee *only of the RISC*, and the

12  RISC does <u>not</u> contain an arbitration clause.  The Buyer's Order contains no

13  assignment box (Docket No. 8-1), whereas the RISC does contain one, which states

14  "Seller assigns its interest in this contract to American Credit Acceptance under the

15  terms of Seller's agreement(s) with Assignee." Docket No. 8-2. ACA has presented

16  no evidence that it was ever assigned the Buyer's Order. Indeed, there would be no

17  reason to assign the Buyer's Order to ACA in the first place, as the RISC is the loan

18  document, sets out the payment schedule, and is the legal document which ACA

19  would enforce against the Loyolas in the event of a default.  Logically, that is why

20  the RISC has the assignment box, and the Buyer's Order does not.  Conspicuously

21  missing from ACA's declaration is a copy of its master assignment agreement with

22  LHM Toyota (referenced as "Seller's agreement(s) with Assignee" in the

23  assignment box), which would presumably explain exactly what ACA was taking

24  assignment of.

25      None of the defendants has met their burden to show they were an agent of

26  LHM Toyota either.  Plaintiff alleged in the complaint that all defendants were

27  agents of *each other*, but not that any of them were agents of LHM Toyota, the

28  signatory to the Buyer's Order.  Complaint, ¶ 10.  Moreover, such general agency

4

1  allegations in a complaint are insufficient to meet the defendant's burden to show

2  agency when moving for arbitration. Roes v. SFBSC Management, LLC, 656

3  Fed.Appx. 828 (9th Cir. 2016).[1] Rather, the non-signatory defendant has the burden

4  to prove through its own agreements and conduct, that there was *control* sufficient

5  to be an agent of a signatory. Murphy v. DirecTV, Inc., 724 F.3d 1218, 1232–33

6  (9th Cir. 2013) (refusing to allow Best Buy to compel arbitration as an agent,

7  because "Best Buy has presented no evidence ... that DirecTV controlled its

8  behavior in ways relevant to Plaintiffs' allegations"). There is no evidence of

9  control by LHM Toyota over any of the defendants, nor that non-signatory ACA

10  had control over defendants Par or Lee-Barker. Defendants' failure to produce their

11  respective business agreements with each other is telling, for these agreements

12  likely recite that the repossession agents were acting as independent contractors.

13       Nor can defendants invoke the doctrine of equitable estoppel to gain standing.

14  "Because generally only signatories to an arbitration agreement are obligated to

15  submit to binding arbitration, equitable estoppel of third parties in this context is

16  narrowly confined." Murphy v. Directv, Inc., 724 F.3d 1218, 1229 (9th Cir. 2013)

17  (citing Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1046 (9th Cir. 2009)). A

18  nonsignatory to an arbitration agreement may equitably estop a signatory from

19  avoiding arbitration "only under two very specific conditions:

20         (1) when a signatory must rely on the terms of the written
          agreement in asserting its claims against the nonsignatory or
21         the claims are intimately founded in and intertwined with the
          underlying contract, and (2) when the signatory alleges
22         substantially interdependent and concerted misconduct by the
          nonsignatory and another signatory and the allegations of
23         interdependent misconduct are founded in or intimately
          connected with the obligations of the underlying agreement.
24

25  [1] See also Swift v. Zynga Game Network, Inc., 805 F.Supp.2d 904, 916 (N.D. Cal.
   2011) (declining to treat "agency" allegations as binding where defendants denied that
26  they were agents and discovery subsequently revealed that the defendants were actually
   "independent contractors"); Nat'l Abortion Fed'n v. Ctr. for Med. Progress, 134
27  F.Supp.3d 1199, 1205–06 (N.D. Cal. 2015) (declining to treat alter ego allegations in
   complaint as binding judicial admissions on an issue for which defendants later had the
28  burden of proof).

1    Id. (citing Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1128-29 (9th Cir. 2013)).

2    "This rule reflects the policy that a plaintiff may not, on the one hand, seek to hold

3    the nonsignatory liable pursuant to duties imposed by the agreement, which

4    contains an arbitration provision, but, on the other hand, deny arbitration's

5    applicability because the defendant is a non-signatory." Id.

6        The Ninth Circuit has consistently rejected the equitable estoppel doctrine in

7    the arbitration context, making it clear that a non-signatory defendant has a heavy

8    burden to compel arbitration under this theory: "We have never previously allowed

9    a non-signatory defendant to invoke equitable estoppel against a signatory plaintiff,

10   and we decline to expand the doctrine here." Rajagopalan v. Note World, LLC, 718

11   F.3d 844, 847 (9th Cir. 2013).

12       The required elements of equitable estoppel are not met here.  Plaintiffs are

13   not relying on the terms of the Buyer's Order to assert any claim in the complaint,

14   nor are plaintiffs' claims intimately intertwined with the Buyer's Order.  Plaintiff's

15   claims are all based on statutory, not contractual duties:  i.e. the UCC, Consumer

16   Protection Act, and FDCPA.  Plaintiffs do not even make reference to the Buyer's

17   Order, an irrelevant document, because it was the RISC that governed the

18   relationship between plaintiffs and ACA.  The RISC has no arbitration clause, and

19   ACA was enforcing the RISC when it ordered a repossession.

20       Plaintiffs' complaint makes no reference to any agreement with an arbitration

21   clause.  Even if it had though, "Merely making reference to an agreement with an

22   arbitration clause is not enough. Equitable estoppel applies when the signatory to a

23   written agreement containing an arbitration clause must rely on the terms of the

24   written agreement in asserting its claims against the nonsignatory." Kramer, 705

25   F.2d at 1129.  In Kramer, purchasers of Toyota vehicles brought a class action

26   against Toyota the manufacturer for allegedly including a defective braking system

27   in the vehicles. 705 F.3d at 1124. Each class member signed a purchase agreement

28   containing an arbitration clause with a Toyota dealer. Id. at 1124-25. Although the

manufacturer was not a signatory to the purchase agreements, it sought to enforce the arbitration agreements, arguing plaintiffs were equitably estopped from asserting the manufacturer's nonsignatory status as a bar to compelling arbitration. Id. at 1125-1126.

The Ninth Circuit disagreed with the manufacturer, and even though plaintiff had asserted breach of warranty claims, held that plaintiffs' claims against the manufacturer did not rely on any provision in the purchase agreements and, instead, were based on the manufacturer's independent duties owed to the customers. 705 F.3d at 1128-1134. In so ruling, the Ninth Circuit rejected the manufacturer's argument that plaintiffs' claims were necessarily intertwined with the purchase agreements because the lawsuit was predicated on the fact a vehicle purchase occurred. Id. at 1131-1132. The court explained that although plaintiffs' causes of action presumed a vehicle sale, the claims did not rely upon the existence of the purchase agreement, and instead the causes of action arose under state laws or duties to the plaintiffs that were independent from the underlying purchase agreements. Id. at 1130-1131.

The Ninth Circuit relied on its holding in Kramer to reach a similar conclusion in Murphy, 724 F.3d 1218. In Murphy, customers alleged that Best Buy and DirecTV worked together to defraud and mislead DirecTV purchasers in violation of certain consumer protection statutes. Id. at 1223-24. DirecTV's "Customer Agreement" had an arbitration agreement with the consumers and it precluded class actions. Id. at 1224. Best Buy was not a party to the Customer Agreement. Yet, Best Buy moved to compel arbitration under the agreement and the district court granted the motion, finding that equitable estoppel compelled that result. Id. at 1228-29. The Ninth Circuit reversed, finding that plaintiffs' claims against Best Buy did not rely on the substance of their agreement with DirecTV, since the claims focused on alleged misrepresentations by Best Buy in selling the product. 724 F.3d at 1230-31. In the court's words, none of plaintiffs' allegations

"rely on the Customer Agreement or attempt to seek any benefit from its terms." Id. at 1230. The court specifically rejected Best Buy's argument that equitable estoppel applied because plaintiffs' claims depended on the existence of the DirecTV agreement:

> [As in Kramer], here, the Customer Agreement proves at most the existence of a transaction; Plaintiffs' claims do not depend on the Agreement's terms. The UCL and CLRA allow Plaintiffs to sue Best Buy for misleading consumers regardless of whether or not they signed largely unrelated contracts with DirecTV.

Id. at 1231.

Here, the Buyer's Order "proves at most the existence of a transaction." Murphy, 724 F.3d at 1231. Plaintiff's claims do not "rely on" any term of the Buyer's Order. Plaintiff does not seek to enforce the terms, duties or obligations of that document or the RISC, against any party. Plaintiff's claims are instead brought for violations of independent duties contained in three statutes, the UCC, the CPA, and the FDCPA.

B.    The Arbitration Clause Is Inapplicable By Its Own Language

1. *The Buyer's Order Expressly Adopts Court As The Chosen Forum*

The Buyer's Order states that the parties must arbitrate any dispute between them relating to "the Retail Installment Contract (except where such Contract includes its own dispute resolution provision, in which case such provisions shall control any claim arising under or relating to said Contract)." Docket No. 8-1, "Agreement to Arbitrate," ¶ 1. Under this language, the Buyer's Order specifically provides that its dispute resolution procedures (i.e. arbitration) do not apply if there are different dispute resolution procedures set forth in the RISC.

That is the case here. The Loyola RISC expressly contemplates only *court action* to enforce its provisions.  There is no mention of arbitration. The RISC states that if the borrower breaches, he will have to pay reasonable attorneys fees "and court costs." Docket No. 8-2, back page, ¶ 3c.  The RISC also states that if the

vehicle is repossessed and sold, the borrower will have to pay such "attorneys fees and court costs the law permits."  Id., ¶ 3f.  Such references to court costs or court actions indicate that the parties intended court, not arbitration, as their chosen forum. State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders, 228 W.Va. 125, 717 S.E.2d 909 (W. Va., 2011)(references to possibility of "court action" negated arbitration clause, creating ambiguity to be construed against the drafter).

The plain language of the Loyola Buyer's Order thus mandates that the Loyola RISC controls in case of a conflict as to dispute resolution. The RISC governs.

*2.  The Arbitration Clause Expressly Excludes Plaintiffs' Claims Against The Non-Signatory Defendants*

The arbitration clause in the Buyer's Order is limited to disputes between LHM Toyota and plaintiffs, of which there are none: "*Purchaser(s) and Dealer* ("Parties) agree, except as otherwise provided in this Arbitration Provision, to resolve by binding arbitration any *Dispute* that arises *between them* under or relating to this Agreement . . ." Docket No. 8-2, ¶ 20 (emphasis added).

The italicized words show that plaintiff's claims in the complaint are not covered by the arbitration clause.  The term "Purchaser(s)" is defined on the front of the Buyer's Order to be Hector and Linda Loyola, under "Purchaser's Names." Docket No. 8-1, first page, top.  The term "Dealer" is never defined, but the dealer is listed on the front of the agreement as "LHM Toyota Spokane."  The term "Dispute" is never defined.

The key limiting words in this arbitration clause are "*between them*," which plainly affords coverage only to disputes between "Purchaser(s)" (the Loyolas) and "Dealer" (LHM Toyota Spokane).  Disputes between the Loyolas and *third parties*, such as any alleged assignees of the dealer, or an assignee's independent contractor repossession agencies, are not within the scope of the clause.  Such disputes could

1  easily *have been* included by defining third parties to come within the definition of

2  "Dealer," or within the definition of "Dispute."  But this contract doesn't do that.

3  Any ambiguity due to the undefined special terms should be construed against the

4  drafter, and in favor of plaintiffs, who did not draft this adhesion contract.

5  C.    The Arbitration Clause Is Illegal Under The Single Document Rule

6         Washington, like several other states, prohibits automobile sales from being

7  memorialized in more than one document: "Every retail installment contract shall

8  be contained in a single document which shall contain the entire agreement of the

9  parties including any promissory notes or other evidences of indebtedness between

10 the parties relating to the transaction . . ." RCW § 63.14.020.

11        The purpose of the single document requirement is to protect buyers from the

12 deception and ambiguities which arise when more than one document is utilized to

13 express the contract. The courts have thus overwhelmingly held that when the seller

14 has violated the single document rule, and there is both a RISC and a separate

15 agreement with an arbitration clause, the RISC governs and the separate arbitration

16 agreement is illegal and unenforceable.  Lambert v. National Motors, Inc., 2011

17 WL 1704726 (D. Md. May 4, 2011)(Maryland's single document rule precluded

18 enforcement of arbitration clause in sales contract, because "the agreements within

19 the four corners of the installment contract are the only agreements that apply to the

20 transaction, and the arbitration clause is not one of them."); Rugumbwa v. Betten

21 Motor Sales, 136 F.Supp.2d 729, 732-33 (W.D. Mich., 2001)(holding that an

22 arbitration provision included in the auto sales contract, but not in the retail

23 installment contract, is unenforceable under Michigan's single document rule);

24 Gibbs-Bolender v. CAG Acceptance, LLC (D. Nev., February 18, 2015), at p. 9

25 (noting that most courts have held that a state's single document rule voids any

26 separate arbitration agreements); Larkin v. New Century Auto Sales Inc., No. 12-

27 13917, 2014 WL 29119, at *12 (E.D. Mich. Jan. 3, 2014) ("the stand alone

28 Arbitration Agreement is unenforceable as a matter of law because it is a stand

1    alone document and not part of the retail installment sales contract as required

2    pursuant to MVSFA"); <u>Knight v. Springfield Hyundai</u>, 81 A.3d 940, 948-49 (Pa.

3    Super. Ct. 2013)(no enforceable arbitration agreement under Pennsylvania's single

4    document rule when purchase order contains arbitration, and retail installment sales

5    contract does not); <u>Baker v. Antwerpen Motorcars Ltd.</u>, 807 F. Supp. 2d 386, 390

6    (D. Md. 2011)(same).

7    D.    <u>The Integration Clause Of The RISC Nullifies The Buyer's Order</u>

8         Even in states without a single document rule in their retail installment sales

9    law, the courts apply ordinary contract interpretation principles to refuse to enforce

10   arbitration clauses when there exists both a sales contract (with arbitration) and a

11   retail installment sales contract (without arbitration). As stated in one of the leading

12   arbitration treatises: "Thus, if a car dealer places an arbitration agreement in the

13   sales order or other preliminary document but not in the final installment sales

14   agreement, the arbitration agreement is not part of the final transaction and is not

15   binding on the consumer." National Consumer Law Center, <u>Consumer Arbitration</u>

16   <u>Agreements</u>, § 6.9.4.2 (7th Ed. 2015).

17        These courts rely upon the integration clause of the RISC to hold that all the

18   parties' agreements are contained only in the RISC. <u>See</u> <u>Knight v. Springfield</u>

19   <u>Hyundai</u>, 81 A.3d 940, 948 (Pa. Super. Ct. 2013)(integration clause in retail

20   installment sales contract superceded arbitration clause in sales order); <u>Davis v. KB</u>

21   <u>Home of South Carolina Inc.</u>, 713 S.E.2d 799, 806 (S.C. App., 2011)(arbitration

22   clause in employment application was superceded by an employment agreement

23   with no arbitration clause); <u>Patton v. Jeff Wyler Eastgate, Inc.</u>, 608 F.Supp.2d 907

24   (S.D.Ohio 2007)(RISC is the operative document, not the buyer's order).

25        The case of <u>Duval Motors Co. v. Rogers</u>, 73 So.3d 261, 265-69 (Fla. App.,

26   2011) is particularly instructive, because like this case, the plaintiffs brought claims

27   for wrongful repossession against the lender, which the lender sought to compel to

28   arbitration. There was a RISC and a buyer's order, with only the buyer's order

11

1  containing arbitration. The <u>Duval</u> court concluded that the integration clause in the

2  RISC and the parol evidence rule prevented the buyer's order (RBO) from being

3  enforceable.  The court noted that "the important inquiry is whether the RISC

4  incorporates the RBO, not whether the RBO incorporates the RISC. The RISC does

5  not mention the RBO. As a result, the RBO is irrelevant to the disputes arising out

6  of the transaction at issue." <u>Id</u>. at 269.

7      This case is no different from <u>Duval</u>. The Loyola RISC contains an

8  integration/merger clause which states: "This contract contains the entire agreement

9  between you and us relating to this contract."  Docket No. 8-2, page 1, "How This

10  Contract Can Be Changed."  The Loyola RISC nowhere mentions or incorporates

11  by reference the Buyer's Order. And, the Buyer's Order specifically states that the

12  RISC controls in case of conflict. Docket No. 8-1, "Agreement to Arbitrate," ¶ 1).

13  Under the above authorities, the RISC is the only operative document in the

14  Loyolas' case, and it contains no arbitration clause.

15  E.    The Arbitration Agreement Is Procedurally Unconscionable

16      Under Washington law, a contract may be invalid based on either substantive

17  or procedural unconscionability.  <u>Al-Safin v. Circuit City Stores, Inc.</u>, 394 F.3d

18  1254, ¶ 22 (9th Cir. 2005); <u>Zuver v. Airtouch Communications, Inc.</u>, 153 Wash.2d

19  293, 303 (2004). Procedural unconscionability is the lack of meaningful choice,

20  considering all the circumstances surrounding the transaction including (1) the

21  manner in which the contract was entered, (2) whether each party had a reasonable

22  opportunity to understand the terms of the contract, and (3) whether the important

23  terms were hidden in fine print. <u>Torgerson v. One Lincoln Tower, LLC</u>, 166

24  Wash.2d 510, 518-519 (2009); <u>Zuver</u>, 153 Wash.2d at 303.  Whether a contract is

25  one of adhesion depends upon an analysis of the following factors: "(1) whether the

26  contract is a standard form printed contract, (2) whether it was prepared by one

27  party and submitted to the other on a take it or leave it basis, and (3) whether there

28  was no true equality of bargaining power between the parties." <u>Zuver</u>, at 304.

All of these factors point to a great deal of procedural unconscionability in this case, as explained below.

• Unequal bargaining power.  The Loyolas are a couple living on limited retirement income who were desperate for a vehicle, as their old van was not operating properly, they were in financial difficulty, they had challenged credit, and had been turned down for credit by other dealerships. Loyola Decls., ¶¶ 2-5. Mrs. Loyola was also quite physically ill at this time. Linda Loyola Decl., ¶ 7.  The Loyolas accepted a 28% interest rate just to buy a used beater with 90,000 miles on it, for a total cost of almost $36,000.

• "Take it or leave it" contract.  The pre-printed papers were drafted by the dealership with no opportunity to interlineate oppressive provisions. Loyola Decls., ¶ 9.

• Fine print.  The arbitration clause appears on the back of the Buyer's Order in tiny print. The version produced by ACA is admittedly *enlarged*, yet the print is *still* less than the minimum eight-point print required by the Washington Retail Installment Sales Act. RCW § 63.14.020.

• No copy given.  In violation of RCW § 63.14.030, the salesperson did not leave a copy of the Buyer's Order with the Loyolas, and the acknowledgment of receiving a copy violates the law, for it is in less than ten point type, and not bolded. RCW § 63.14.030. Loyola Decls., ¶ 8.

• Surprise. The salesperson never mentioned that the Buyer's Order contained an arbitration clause. Indeed, the Loyolas had no idea they were even signing two separate contracts. Loyola Decls., ¶ 8. The arbitration clause has no space for the buyer to initial, which might have called attention to it.

• Home solicitation.  The contract was signed at plaintiffs' home, which the Washington Legislature considers to be a pressured environment for the consumer, who may sign without adequate negotiation, just to get the salesperson to leave their private space.  The home solicitation act provides for a three-day right to

1  cancel transactions consummated in the home, yet the salesperson never disclosed

2  this right to the Loyolas.  RCW § 63.14.154(1)(a); Loyola Decls., ¶ 8.

3     • Time pressure.  The salesperson told the Loyolas she was concerned about

4  coming alone to their home because of the bad neighborhood, and they would have

5  to sign quickly. Hector Loyola Decl., ¶ 7. Linda was not in the room when the

6  terms of the transaction were discussed, and merely signed where she was told.

7  Linda Loyola Decl., ¶ 10.

8     • Yo-yo auto sale.  In a yo-yo auto sale, the dealership gives possession of the

9  car to the buyer for a few days before consummating the contract.  This puts

10  pressure on the consumer to go through with the deal, after enjoying the car and

11  having shown it already to friends and family.  The dealership gave possession of

12  the car to the Loyolas about three days before coming to their home for signing.

13  Loyola Decls., ¶ 6.

14     • Single document rule violation.  The dealership violated the single

15  document rule by having the Loyolas sign multiple agreements.  RCW § 63.14.020.

16  F.    The Arbitration Agreement Is Substantively Unconscionable

17     Substantive unconscionability alone is sufficient to render a contract invalid.

18  Kam-Ko Bio-Pharm Trading Co., Ltd v. Mayne Pharma (USA)Inc., 560 F.3d 935,

19  940 (9th Cir. 2009); Adler v. Fred Lind Manor, 153 Wash.2d 331, 346-47, 103 P.3d

20  773 (2004). Substantive unconscionability arises in those cases where a clause or

21  term in the contract is one-sided or overly harsh.  Torgerson v. One Lincoln Tower,

22  LLC, 166 Wash.2d 510, 519, 210 P.3d 318 (2009).

23     There are numerous oppressive and one-sided provisions hidden in the fine

24  print of the Buyer's Order.  They reflect a concerted plan to extinguish various

25  statutory rights of the Loyolas, tilt the playing field in arbitration, and reserve the

26  court system for the key claims the dealership might need to bring. Together, these

27  provisions shock the conscience and permeate the contract with unconscionability.

28

14

*1. Creditor Retains Court Rights For Repo, Replevin, Provisional Remedies*

The quintessential unconscionable one-sided arbitration clause relegates the weaker party's claims to arbitration, while reserving the most important claims of the more powerful party for the court system. The Buyer's Order does exactly this by permitting the dealer to exercise provisional remedies related to the collateral in court, such as repossession, replevin, or injunctive relief.  The Buyer's Order accomplishes this with the following language: "The Parties retain the right to exercise self-help or provisional remedies, such as repossession, and to file a replevin action in court." Docket No. 8-1, ¶ 20, first stanza.  Although facially neutral, in the real world a consumer never has a replevin, injunction, or self-help repossession remedy relating to the collateral.  These are remedies needed only by the dealership, to enforce the contract after default and protect the dealer's interests. At the same time, all of the consumer's possible claims relating to a repossession, such as for breach of the peace or wrongful repossession without default, are relegated to arbitration.

Time and again, courts have struck down similar one-sided provisions which reserve the the dealer's right to bring replevin or provisional remedies in court. Cisneros v. American Gen. Fin. Servs., Inc., Case No. C 11-02869 CRB (N.D. Cal., July 23, 2012)(arbitration provision which permitted creditor self-help repossession and judicial remedy of replevin lacked bilaterality and was unduly one-sided and harsh, for these "are the only practical remedies Defendant would ever seek against consumers"); Jones v. Wisconsin Auto Title Loans, Inc., 714 N.W.2d 155, at pp. 172-174 (Wisconsin Supreme Court 2006)(arbitration provision which excepted title lender's debt collection remedies from arbitration, including replevin, and relegated consumer's claims to arbitration, was unconscionable); Taylor v. Butler, 142 S.W.3d 277, 286 (Tenn., 2004)("City Auto has a judicial forum for practically all claims that it could have against Taylor. Indeed, it is hard to imagine what other claims it would have against her other than one to recover the vehicle or collect a

1   debt. At the same time, Taylor is required to arbitrate any claim that she might have

2   against City Auto"); Hopkins v. New Day Financial, 643 F.Supp.2d 704, 719-720

3   (E.D. Pa., 2009) (clause which reserved court for replevin and judicial foreclosure

4   remedies "has the effect of arbitrarily permitting Defendant New Day to access the

5   court system without providing Plaintiffs with the same benefit"); Williams v.

6   Aetna Fin. Co., 83 Ohio St.3d 464, 700 N.E.2d 859, 866 (1998) (clause that

7   required all disputes "other than judicial foreclosures and cancellations regarding

8   real estate security" to be resolved in arbitration was unconscionable); Arnold v.

9   United Cos. Lending Corp., 204 W.Va. 229, 511 S.E.2d 854, 861-62 (1998) (lender

10  retained the right to a judicial forum for purposes of provisional remedies);

11  Ferguson v. Countrywide Credit Indus., Inc., 298 F.3d 778, 784-86 (9th Cir.2002)

12  (holding unconscionable under California law employment contract compelling

13  arbitration of claims employee most likely to bring against employer, but not claims

14  employer most likely to bring against employee).

15          *2. Extinguishes Consumer's Statutory Right to Fees and Costs*

16          The arbitration clause states "Each party shall be responsible for its own

17  attorneys and expert fees and any other costs incurred." Docket No. 8-1. This

18  removes the Loyola's statutory right to attorneys fees under the FDCPA and the

19  CPA, even if they were to prevail in the arbitration. The provision therefore strips

20  the Loyolas of fundamental statutory rights, and is unconscionable.

21          *3. Allows Arbitrator To Impose Defendants' Fees and Costs On Plaintiffs*

22          The arbitration clause provides: "The arbitrator may decide which party is

23  responsible for paying any costs and fees as part of the decision and award."  This

24  provision is one-sided for it strips plaintiffs of major protections in the FDCPA and

25  CPA. The FDCPA allows attorneys fees to the prevailing defendant only if the

26  plaintiff's claims are in bad faith and brought to harass.  15 U.S.C. § 1692k(a)(3).

27  The CPA is a one-way fee shifting statute, and does not permit the defendant to

28  recover fees at all. RCW § 19.86.090.  This provision therefore strips out these

1  essential protections against a fee award being entered against a losing plaintiff.

2  The clause is a major deterrent to a claim even being brought by a consumer, who

3  may not want to risk a catastrophic judgment, despite owning a valid claim.  On the

4  other hand, this provision doesn't affect the corporate defendant, who is already

5  liable under the FDCPA and CPA for the attorneys fees of the consumer, upon

6  losing a case.

7      *4. Requires Consumer To Bear Costs Of A Successful Appeal*

8      The arbitration clause states: "The cost of appeal shall be born by the

9  appealing party." Docket No. 8-1. This provision is one-sided, for it means that

10  even if the consumer wins an appeal in court, and overturns a defective arbitration

11  award, he or she must bear his own costs for bringing that appeal.  The provision

12  turns successful consumer appeals into pyrrhic victories, and negates applicable

13  consumer fee/cost shifting statutes (which apply to appeals). On the other hand, the

14  provision is no deterrent to corporate litigants bringing an appeal, who normally

15  have to bear their own fees and costs anyway, upon winning an appeal.

16      *5. Requires Consumer To Pay Fees and Costs Of An Unsuccessful Appeal*

17      The arbitration clause provides: "If a party unsuccessfully challenges the

18  arbitrator's award or fails to comply with it, the other Party is entitled to recover the

19  costs, including reasonable attorneys' fees, of defending or enforcing the award."

20  This provision is also harsh and one-sided in effect.  A consumer who loses an

21  appeal under CPA is not responsible for the other party's fees and costs, and not

22  responsible under the FDCPA unless the appeal is in bad faith. This provision

23  heavily penalizes an unsuccessful non-frivolous appeal by the consumer, who not

24  only must bear their own fees and costs, but now must pay the corporation's

25  attorneys fees and costs.  That would not happen after an unsuccessful appeal under

26  the FDCPA or CPA.  Defendants are not affected at all by this provision, as they

27  already have to pay the consumer for his/her fees and costs upon losing an appeal.

28

*6. Prohibits Protections Against Unconscionability Offered By The Arbitration Forum*

This arbitration clause guarantees its own oppressive provisions, by stating that in the case of a conflict between the contract and the rules of the arbitral forum, the contract governs. Docket No. 8-1. Thus if an arbitration forum has a rule prohibiting a corporate defendant from recovering costs or fees from the consumer claimant unless the claim was frivolous, that rule doesn't apply and the defendant can still insist on being paid fees and costs for winning a non-frivolous claim. The defendant could also insist that the consumer pay the defendant's costs of an unsuccessful appeal by the consumer, even if the arbitration forum prohibits this. Arbitration forums are not known for their consumer-friendly rules, but if they do have them, this provision takes care of the problem for the creditor.

G.    The Court, Not The Arbitrator, Must Decide This Motion

*1. Non-Signatories Cannot Invoke A Delegation Clause*

Arbitrability is a "gateway" issue that is presumptively to be resolved only by the court. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002). The Ninth Circuit rule is that a non-signatory cannot invoke a provision delegating validity and formation issues to the arbitrator. Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126-27 (9th Cir. 2013)("[Delegation] provisions are part of the agreement and only apply to signatories. Toyota cannot invoke the right to the benefits of the Purchase Agreement because it was not a party to the agreement; thus, the threshold issue of whether Toyota, as a nonsignatory, may compel Plaintiffs to submit to arbitration under the Purchase Agreements must be decided by this Court").

*2. No Clear and Unmistakable Delegation*

Plaintiffs' opposition presents several gateway issues,[2] which may be referred to an arbitrator only if there is "clear and unmistakable" evidence that the parties agreed to this.  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995). The clause in this case is not clear and unmistakable.

As explained above, the delegation clause was hidden in tiny type on the back of the Buyer's Order.  The typeface was required to be at least eight point. RCW § 63.14.020. Defense counsel admits to enlarging the Buyer's Order by an order of magnitude, but even the enlarged copy presented to the court is very tiny and hard to read, far less than eight point type. Plaintiffs also were not given a copy of the delegation clause in violation of RCW § 63.14.030. The agreement to delegate arbitrability was therefore not the "clear and unmistakable" one required to rebut the presumption that the court must decide gateway issues.

*3. Delegation Clause Is Unenforceable Under The Single Document Rule*

Even if the parties clearly and unmistakably agree to delegate arbitrability, the court must still decide any challenge to the enforceability of the delegation clause itself. Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 70 (2010).

No agreement to delegate arbitrability ever formed here under Washington contract law, because the delegation clause was prohibited by the single document rule, being in a separate agreement. Plaintiffs assert the provision is illegal, and the court must decide the illegality issue.  See Gibbs-Bolender v. CAG Acceptance, LLC (D. Nev., February 18, 2015)(argument that delegation clause was never formed due to violation of single document rule was "an independent and severable challenge to the delegation provision" which had to be decided by the court).

---

[2] When one agreement contains an arbitration clause and a second agreement does not, the legal question before the court is one of contract formation, not the scope of the clause. Applied Energetics, Inc. v. Newoak Capital Markets, LLC, 645 F.3d 522, 526 (2nd Cir. 2011); Davis v. KB Home of South Carolina Inc., 713 S.E.2d 799, 804 (S.C. App., 2011)(dueling contracts issue is a "gateway" matter for the court to decide).

1     *4. Delegation Clause Is Substantively Unconscionable*

2         The delegation clause is also substantively unconscionable.  Plaintiffs

3     contend that at least five arbitration procedures mandated by the contract are harsh

4     and one-sided, rendering the arbitration forum itself to be procedurally unfair. See

5     Section F, above. Plaintiffs cannot escape these unfair waivers of their rights,

6     because the arbitration clause also unconscionably mandates that the contract

7     controls over the arbitration forum's own procedures. Now, defendants insist that

8     the delegation clause requires plaintiffs to enter this same forum, under the same

9     unfair handicaps, to decide arbitrability, when the forum stands to gain financially

10    by turning down plaintiffs' challenges.  As one treatise explained about this Catch-

11    22 situation, "It would be unfair, after all, to require a party to submit to an unfair

12    arbitral forum for the purpose of demonstrating that the arbitral forum is unfair."

13    National Consumer Law Center, Consumer Arbitration Agreements, § 2.2.3 (7th Ed.

14    2015).

15    H.    The Complaint Should Not Be Dismissed

16        While the court may have discretion to dismiss instead of stay the action,

17    doing so would only complicate this case for the parties and the court.  If the court

18    were to enter a dismissal with or without prejudice after compelling arbitration, that

19    decision would be immediately appealable, requiring plaintiff to file an appeal

20    while the arbitration is ongoing. Green Tree Financial Corporation v. Randolph,

21    531 U.S. 79 (2000); Interactive Flight Technologies, Inc. v. Swiss Air Transp. Co.,

22    249 F.3d 1177, 1179 (9th Cir. 2001).

23        A stay and retention of jurisdiction, if arbitration is ordered, is more practical

24    for several reasons: (1) in case the arbitration cannot proceed due to nonpayment of

25    arbitration fees; (2) to confirm the arbitration award, so that the prevailing party

26    does not have to open a new court case to enforce the award; and (3) to determine

27    any non-arbitrable issues in court, if the arbitrator or court rules that there are such

28    issues.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III. CONCLUSION

For all of the foregoing reasons, plaintiffs request that the defendants' motion to compel arbitration be denied.

Dated:  March 1, 2019                    Respectfully Submitted,
                                         TRUEBLOOD LAW FIRM


                                         By:    /s *Alexander B. Trueblood*
                                                Alexander B. Trueblood

                                         Attorneys for Plaintiffs
                                         HECTOR and LINDA LOYOLA